**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **DANIEL H.,**[1] | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 22 C 2793** |
| | ) | |
| v. | ) | **Magistrate Judge Jeffrey Cole** |
| | ) | |
| **KILOLO KIJAKAZI,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff applied for Supplemental Security Income under Title XVI of the Social Security Act, 42 U.S.C. §§1381a, 1382c, a little more than three years ago in February of 2020. (Administrative Record (R.) 199-208). He claimed that he had been disabled since December 18, 2019 (R. 199) due to a brain injury and left eye blindness as a result of a gunshot wound to the head. (R. 223). Over the next two years, plaintiff's application was denied at every level of administrative review: initial, reconsideration, administrative law judge (ALJ), and appeals council. It is the final ALJ's decision that is before the court for review. See 20 C.F.R. §§404.955; 404.981. Plaintiff filed suit under 42 U.S.C. § 405(g) on May 26, 2022, and the parties consented to my jurisdiction pursuant to 28 U.S.C. § 636(c) on June 8, 2022. [Dkt. #4]. Plaintiff asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

---

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the Social Security applicant in an Opinion. Therefore, the plaintiff shall be listed using only their first name and the first initial of their last name.

### I.

### A.

Plaintiff was born on December 11, 2000, and was just 19 years old when he claims he became unable to work. (R. 199). He certainly was unable to work for some period of time as he was shot in the face while sitting in his car at a stoplight in Chicago on December 18, 2019. (R. 328). He was brought to the emergency room, underwent surgery, and began an extended hospital stay for treatment. He lost the use of his left eye. (R. 328). He began intensive inpatient rehabilitation on January 15, 2020 and was finally discharged to his home with his mother on February 12, 2020. (R. 1354). A CT scan of his head on the day before his discharge showed posttraumatic encephalomalacia in large portions of the left temporal lobe, the lateral convexity of the left parietal lobe, and the orbitofrontal gyri. (R. 1414). His feeding tube was finally removed on February 13, 2020. (R. 1822). But his course of outpatient treatment and rehabilitation thereafter proved successful.

Plaintiff had a psychological evaluation on March 18, 2020. (R. 2062). He was alert and oriented, and his speech was clear and coherent with some evidence of paraphasia requiring additional time and checking for accuracy of his responses. (R. 2063). He was aware of his deficits and could describe events leading up to his injury and his experiences after regaining consciousness in the hospital. Plaintiff's affect was restricted, and his mood appeared mildly anxious. He reported some sadness with tearfulness after regaining consciousness, but he said that he no longer felt sad or tearful and denied a depressed mood. He denied he had problems with memory. Plaintiff did say he had symptoms of PTSD including hypervigilance and mild sleep disturbance. He said that his sleep was disrupted once a night, but he could fall back to sleep easily. (R. 2063). Plaintiff continued

to participate in therapy, with his final appointment being May 11, 2020. (R. 2065-73). Plaintiff began a course of vocational rehabilitation in March 2020. (R. 2075).

At a neurology follow-up visit in July 2020, physical examination was normal with the exception of the left eye and mild swelling and warmth in the leek temple and cheek. Neurological exam was normal. Plaintiff was alert and oriented to person, place, and time. Language was spontaneous and fluent with appropriate prosody, naming, comprehension and repetition, and no paraphasic errors. Plaintiff was able to perform serial 7s and exhibited good short and long-term recall. He could follow complex commands, and identify and ascribe purpose to objects. (R. 2417-18). Coordination and sensation were normal. Posture and gait were normal, and plaintiff could heel-toe walk and tandem gait. (R. 2419). The neurologist said that plaintiff had "recovered tremendously with minimal neurologic deficits and complete loss of vision in the left eye." (R. 2421).

Plaintiff had a follow-up psychological exam on December 11, 2020. Affect was full, mood euthymic, thought processes were logical. Plaintiff denied depression. He reported random nightmares and some sleep disturbance, waking during the night, but being able to fall back asleep. He had been cleaning, watching movies and listening to music "to stay positive." (R. 2393).

Dr. Liana Palacci conducted a consultative physical examination on December 21, 2020. (R. 2446-49). Range of motion of the shoulders, elbows and wrists was normal. Bilateral upper extremity strength and grip strength were both 5/5. Ability to perform fine and gross manipulation was normal. Range of motion of the hips, knees and ankles was normal. Lower extremity strength was 5/5 bilaterally. There was no clubbing, cyanosis, edema or atrophy. Plaintiff had some difficulty with tandem walk, but was able to walk on heels and toes as well as squat. Range of

3

motion throughout the spine was normal. Neurological exam was normal. (R. 2448). Affect, memory, appearance, behavior, and ability to relate during the examination were all normal. (R. 2449).

Plaintiff had a car accident at the end of November 2020. He had been texting while driving. He had a seizure the next day. (R. 2480). A head CT scan on November 27, 2020, showed multifocal areas of encephalomalacia. (R. 2457). He was smoking marijuana regularly. (R. 2480). His physical exam and mental status were normal as of December 4, 2020, and he was maintained on Keppra to control seizures. (R. 2480-83). On January 12, 2021, it was noted that plaintiff had stopped taking his medication and had another seizure. He was advised to take his medication "religiously" and avoid alcohol and additional drugs. (R. 2454).

Plaintiff also had vocational counseling from September 17, 2020, to February 17, 2021. (R. 2459). In those five months, plaintiff had eleven meetings or phone conversations with counselors. (R. 2470-72). Plaintiff's job interests were assessed – he wanted to pursue something creative and artistic – and plans varied from conducting a full vocational evaluation to participation in a full schedule of community college courses. (R. 2464). Plaintiff's career interest testing showed counselor and teacher ranked highest. (R. 2464). When plaintiff had his two seizures, his mother expressed concern about his readiness for a full academic schedule. (R. 2464, 2472). One option was to take one class and see how that went; the counselor indicated she would explore other options – such as vocational evaluation or neuropsychological evaluation – and "to determine next best steps. (R. 2472-73).

Apparently, that next step was plaintiff getting a part-time job three days a week, five hours a day at Burlington Coat Factory. Plaintiff began working there March 8, 2021. (R. 214). He

works three days a week in shipment receiving.  (R. 50).  Plaintiff said his job coaches helped him

with the application and the interview process.  (R. 51).  He spoke to them over the phone or his

computer every two to four weeks.  (R. 52).  At the administrative hearing on June 21, 2021,

plaintiff's attorney asked that the record be held open for a letter from plaintiff's job coach to explain

how involved she was in his work.  (R. 44-45). But nothing was ever submitted.  (R. 320).  The

record indicates that, as of April 19, 2021, the last vocational counseling session was February 17,

2021.  (R. 2460-2473).

## B.

After an administrative hearing at which plaintiff, represented by counsel, and a vocational

expert testified, the ALJ determined the plaintiff had the following severe impairments:  left eye

blindness, status post gunshot wound to the head; post traumatic seizure disorder; neurocognitive

disorder, status post traumatic brain injury; and adjustment disorder.  (R. 18).  The ALJ then found

that plaintiff  did not have an impairment  or combination  of impairments  that met  or medically

equaled the severity of one of the  impairments  listed  in the  Listing of Impairments,  20 C.F.R.

Part 404,  Subpart  P, Appendix  1.  The ALJ specifically considered plaintiff's impairments under

Listings 2.02 (loss of central visual acuity), 2.03 (contracting visual fields), 11.02 (post traumatic

seizure disorder),  11.18 (traumatic brain injury), and 12.02 and 12.04 (mental impairments).  (R.

18-19).  As for plaintiff's limitations due to his severe mental impairments, the ALJ found the

plaintiff  had a moderate limitations in the areas of understanding, remembering or applying

information and in concentrating, persisting or maintaining pace.  He had mild limitations in the area

of interacting with others; and adapting or managing oneself.  (R. 19-20).

The ALJ then determined that the plaintiff had the residual functional capacity ("RFC") to perform work at all levels with the following additional limitations:

> [t]he [plaintiff] can never climb ladders, ropes or scaffolds or work around unprotected heights, open flames or unprotected dangerous moving machinery. The [plaintiff] cannot perform work with tasks requiring acute depth perception. The [plaintiff] can only frequently climb ramps and stairs. The [plaintiff] is able to perform simple, routine tasks involving simple work-related decisions and that do not require a fast production rate pace.

(R. 21). The ALJ then reviewed plaintiff's allegations, along with his mother's testimony. The plaintiff testified that he has been unable to work since suffering a gunshot wound to the head. He lives with his mother. He is blind in his left eye and has had a couple of seizures since the incident. He has had no seizures since he began to take anti-seizure medication. He has a driver's license but hasn't driven since his seizures. The plaintiff said he works part time at a large clothing retail store, about 15 hours a week. Outside of work he goes to job coaching at the Division of Rehabilitation Services and researches colleges on his laptop. He is able to use an app to take Uber to work, but does not know how to use the bus. He testified he suffers from amnesia and paranoia and has difficulty concentrating. (R. 22-23). Plaintiff's mother said that plaintiff is unable to live on his own. She confirmed that he hasn't had seizures since going on medication. But, she explained that he needs help "getting back to life" and "adapting to society." He needs reminders about household chores, but performs them well. To her knowledge, he was having no difficulties at his part-time job. (R. 23).

The ALJ found that the plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the [plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the

medical evidence and other evidence in the record for the reasons explained in this decision." (R. 23-24). The ALJ then reviewed the medical evidence, summarizing the surgical and intensive in-patient treatment from December 19, 2010 through discharge on February 5, 2020. (R. 24). Thereafter, plaintiff began a course of outpatient rehabilitative therapy. By July of 2020, he had "recovered tremendously with minimal neurologic deficits" except for the complete loss of vision in the left eye." (R. 24-25). The plaintiff followed up with ophthalmological treatment and was told to wear glasses to protect his remaining good eye and was fitted with a prosthetic to cover his left. (R. 25). A brain CAT scan on February 11, 2020, showed posttraumtic encephalomalacia involving the left temporal area, lateral convexity of the left parietal lobe and orbital frontal gyri. (R. 26).

In March and July of 2020, and January of 2021, plaintiff's condition was stable with generally preserved motor, neurologic, and cognitive functioning. (R. 25). On November 27, 2020, a head CT showed multifocal areas of encephalomalacia most advanced in the left frontotemporal region, left frontal temporal convexity craniotomy without acute hemorrhage or infarction. (R. 26). Musculoskeletal examinations documented normal strength and range of motion, and neurological examinations showed normal gait, stance, heel, toe and tandem walking; intact coordination, sensation to light touch, pinprick, position and vibration sense with normal muscle tone and without evidence of atrophy, fasciculations, pronator or drift of out-stretched arm. (R. 25). In December 2020, musculoskeletal examination showed some mild difficulty with tandem walk, but the plaintiff was able to walk on heels, walk on toes, squat and rise without the need or use of an assistive device. There was full strength in upper and lower extremities, and full range of motion of all joints without evidence of trophic changes, edema, atrophy, cyanosis or clubbing. Neurologic examination demonstrated no abnormalities on cerebellar testing, deep tendon reflexes were intact without loss

of sensation, gait was normal, speech was audible and understandable. Mental status examination was also unremarkable documenting a normal affect, memory, appearance, behavior, ability to related as well as intact cognition with excellent overall effort and cooperation. (R. 26).

As for medical opinions, the ALJ found the opinions from the state agency reviewing physicians, who felt plaintiff was limited to medium work activity with occasional climbing of ladders, ropes and scaffolds; frequent balancing; frequent visual tasks and no concentrated exposure to vibration and hazards, somewhat persuasive. The ALJ felt additionally developed evidence at the hearing level demonstrated no exertional limitations, but some additional postural and visual limitations. (R. 29).

The ALJ found the opinions from the state agency reviewing psychologists, who found plaintiff moderately limited in understanding, remembering and applying information and in concentration, persistence, and pace as well as mildly limited in interacting with others and adapting and managing oneself such that he would retain the mental capacity for work related activities involving simple instructions and routine/repetitive tasks, generally persuasive. The ALJ thought they were consistent with the underlying available medical evidence of record at the time they were prepared and further supported by subsequently developed evidence demonstrating clinically benign findings. (R. 29).

The ALJ noted that the internal medicine consultative examining physician felt plaintiff was able to hear, speak sit, stand and walk greater than 50 feet without an assistive device and handle, lift and carry without any limitations. The ALJ thought this opinion was unpersuasive because it suggested plaintiff had no limitations at all and failed to address the plaintiff's left eye blindness. (R. 29).

8

Based on testimony from the vocational expert, the ALJ then found that plaintiff would be able to perform the requirements of occupations such as a cleaner ( DOT 919.687-014, unskilled, SVP-1, medium in physical demands; approximately 25,000 jobs nationally); hospital cleaner (DOT 323.687-010, unskilled, SVP-2, medium in physical demands; approximately 25,000 jobs nationally); and hotel laundry worker (DOT 361-685-018, unskilled, SVP-2, medium in physical demands; approximately 50,000 jobs nationally). (R. 31). Accordingly, the ALJ found the plaintiff not disabled under the Act. (R. 31-32).

## II.

The court's review of the ALJ's decision is "extremely limited." *Jarnutowski v. Kijakazi*, 48 F.4th 769, 773 (7th Cir. 2022). If the ALJ's decision is supported by "substantial evidence," the court on judicial review must uphold that decision even if the court might have decided the case differently in the first instance. See 42 U.S.C. § 405(g). The "substantial evidence" standard is not a high hurdle to negotiate. *Biestek v. Berryhill*, – U.S. –, –, 139 S. Ct. 1148, 1154 (2019); *Albert v. Kijakazi*, 34 F.4th 611, 614 (7th Cir. 2022). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). To determine whether "substantial evidence" exists, the court reviews the record as a whole, but does not attempt to substitute its judgment for the ALJ's by reweighing the evidence, resolving debatable evidentiary conflicts, or determining credibility. *Reynolds v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022); *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021). Where reasonable minds could differ on the weight of evidence, the court defers to the ALJ. *Karr v. Saul*, 989 F.3d 508, 513 (7th Cir. 2021); *Zoch v. Saul*, 981 F.3d 597, 602 (7th Cir. 2020).

But, in the Seventh Circuit, the ALJ also has an obligation to build what is called an "accurate and logical bridge" between the evidence and the result to allow the court to trace the path of the ALJ's reasoning from evidence to conclusion. *Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015); *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011). The Seventh Circuit has explained that, even if the court agrees with the ultimate result, the case must be remanded if the ALJ fails in his or her obligation to build that "logical bridge." *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)(". . . we cannot uphold a decision by an administrative agency, any more than we can uphold a decision by a district court, if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."); *see also Jarnutowski*, 48 F.4th at 774 (". . . the Commissioner argues, we should affirm the ALJ's decision because it was supported by the evidence. Possibly. But we cannot reach that conclusion from the ALJ's analysis."); *but see, e.g., Riley v. City of Kokomo*, 909 F.3d 182, 188 (7th Cir. 2018)("But we need not address either of those issues here because, even if [plaintiff] were correct on both counts, we may affirm on any basis appearing in the record,....."); *Steimel v. Wernert*, 823 F.3d 902, 917 (7th Cir. 2016)("We have serious reservations about this decision, which strikes us as too sweeping. Nonetheless, we may affirm on any basis that fairly appears in the record."); *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012)("[District court] did not properly allocate the burden of proof on the causation element between the parties,...No matter, because we may affirm on any basis that appears in the record.").

Of course, this is a subjective standard, and a lack of predictability comes with it for ALJs hoping to write opinions that stand up to judicial review. One reviewer might see an expanse of deep water that can only be traversed by an engineering marvel like the Mackinac Bridge. Another might

see a trickle of a creek they can hop across with barely a splash.[2] But, the Seventh Circuit has also called this requirement "lax." *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008); *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008). All ALJs really need to do is "minimally articulate" their reasoning. *Grotts v. Kijakazi*, 27 F.4th 1273, 1276 (7th Cir. 2022); *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016). "If a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables us to trace the path of the ALJ's reasoning, the ALJ has done enough." *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985).[3] The ALJ has done enough here.

---

[2] A perfect example is the aforementioned *Jarnutowski*. There, two judges on the panel felt the ALJ had not adequately explained aspects of her reasoning, 748 F.4th at 774-77, while a third judge, dissenting, thought she did. 748 F.4th at 77-79. The Magistrate Judge who reviewed the ALJ's decision at the district court level also felt the ALJ had adequately explained her reasoning. *Donna J. v. Saul*, No. 19 C 2957, 2021 WL 2206160, at *8 (N.D. Ill. June 1, 2021).

[3] Prior to Sarchet's "logical bridge" language, the court generally employed the phrase "minimal articulation" in describing an ALJ's responsibility to address evidence. *Zalewski v. Heckler*, 760 F.2d 160, 166 (7th Cir. 1985)(collecting cases). The court's focus was on whether an ALJ's opinion assured the reviewing court that he or she had considered all significant evidence of disability. In *Zblewski v. Schweiker*, 732 F.2d 75 (7th Cir. 1984), for example, the court "emphasize[d] that [it] d[id] not require a written evaluation of every piece of testimony and evidence submitted" but only "a minimal level of articulation of the ALJ's assessment of the evidence...in cases in which considerable evidence is presented to counter the agency's position." *Zblewski*, 732 F.2d at 79. In *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985), the court rejected a plaintiff's argument that an ALJ failed to adequately discuss his complaints of pain and was more explicit about how far ALJs had to go to explain their conclusions:

> We do not have the fetish about findings that [the plaintff] attributes to us. The court review judgments, not opinions. The statute requires us to review the quality of the evidence, which must be "substantial," not the quality of the ALJ's literary skills. The ALJs work under great burdens. Their supervisors urge them to work quickly. When they slow down to write better opinions, that holds up the queue and prevents deserving people from receiving benefits. When they process cases quickly, they necessarily take less time on opinions. When a court remands a case with an order to write a better opinion, it clogs the queue in two ways—first because the new hearing on remand takes time, second because it sends the signal that ALJs should write more in each case (and thus hear fewer cases).

> The ALJ's opinion is important not in its own right but because it tells us whether the ALJ has considered all the evidence, as the statute requires him to do....This court insists that the finder of fact explain why he rejects uncontradicted evidence. One inference from a silent opinion is that the ALJ did not reject the evidence but simply forgot it or thought it

(continued...)

### III.

The plaintiff argues that the ALJ's decision must be overturned because she failed to address the plaintiff's need for job coaching services.[4] That's not true. The ALJ noted the plaintiff's testimony about receiving job coaching services. (R. 23). She noted plaintiff's mother testified that plaintiff's counselor had not indicated plaintiff was having any trouble with his job. (R. 23). The ALJ considered and discussed the vocational counseling records:

> the [plaintiff] was referred to vocational counseling to assist the claimant in employment opportunities, including vocational evaluation, testing, job development, training and services (Exhibit 14F/3). At the time, the [plaintiff] "reported he [was] leaning towards return[ing] to school- community college as a goal" (Exhibit 14F/6). Although the [plaintiff's] mother felt the recommendation to a full academic schedule "may be challenging" in January of 2021 (Exhibit 14F/6), the Department of Rehabilitation Services moved the claimant's status to academic training and the claimant was exploring option to considering initially taking one class to gauge his academic performance (Exhibit 14F/15).(R. 27).

To be a bit fairer to the ALJ than the plaintiff might like, that is a rather accurate picture of the vocational counseling records, because there isn't much there. A summary of the counselor's "notes" underscores the ALJ's perception:

> April 15, 2020 – plaintiff had high school education with one semester of community college. Testing was needed to assist plaintiff with his vocational goals.

---

[3](...continued)
irrelevant. That is the reason the ALJ must mention and discuss, however briefly, uncontradicted evidence that supports the claim for benefits.

*Stephens*, 766 F.2d at 287 (citations omitted).

Much more recently, the Seventh Circuit explained that "the 'logical bridge' language in our case law is descriptive but does not alter the applicable substantial-evidence standard." *Brumbaugh v. Saul*, 850 F. App'x 973, 977 (7th Cir. 2021).

[4] Any other arguments the plaintiff might have made are deemed waived. *Milhem v. Kijakazi*, 52 F.4th 688, 693 (7th Cir. 2022); *Jeske v. Saul*, 955 F.3d 583, 597 (7th Cir. 2020).

September 17, 2020 – Recommended full vocational evaluation per DRS referral; emailed DRS counselor to provide contact with plaintiff and mother. (R. 2461).

April 15, 2020 – follow up vocational phone session to discuss plan (R. 2463).

June 23, 2020 – spoke to plaintiff's mother to recommend referral to DRS to assist with employment opportunities. (R. 2463).

July 22, 2020 – reviewed current goals and noted that goals were complete for DRS referral. Plaintiff began interest inventory assessment. (R. 2463)

July 29, 2020 – reviewed interest inventory with plaintiff; noted desire to pursue something creative and artistic. (R. 2464).

August 27, 2020 – plaintiff reported he had not been contacted by DRS counselor; said he was leaning toward return to community college. DRS counselor indicated she was behind on intake calls. (R. 2464).

January 7, 2021 – mother reports DRS counselor recommended full academic schedule; mother felt that was too challenging and reported plaintiff having had a seizure. The counselor said plaintiff and mother should check with plaintiff's neurologist as to readiness for academic work. (R. 2464).

February 9, 2021 – counselor spoke to mother regarding readiness for vocational services and interest in academic course work. (R. 2468).

February 17, 2021 – counselor noted recent seizures and medication and felt plaintiff was not ready for full-time course work. Counselor re-recommended vocational evaluation to assess plaintiff's abilities (R. 2472), but DRS had already followed through with request for academic training and counselor suggested trying one class. (R. 2473).

As the ALJ said, the plaintiff "receiv[ed] vocational rehabilitation services with job search and career planning." (R. 27). The evidence shows there were eleven contacts or sessions over the course of five months. Nothing in the "notes" from those sessions depicts anything as dire as a need for the "highly structured work setting" plaintiff's attorney suggests is necessary in his brief [Dkt. #9, at 11-12], or needing a job coach as a workplace accommodation as his attorney suggested at the hearing. (R. 78-80). The only case the plaintiff manages to cite in support of reversing the ALJ's

13

decision on this point actually runs counter to his arguments. [Dkt. #9, at 11-12]. In *James J. v. Kijakazi*, No. 19-CV-02903, 2022 WL 558364 (N.D. Ill. Feb. 24, 2022), the record included statements from doctors that the plaintiff "would require a minimal amount [of] special supervision beyond what is commonly provided in a typical work setting" and that "his capacity to complete a normal workweek without interruption from mental symptoms is moderately impaired", and statements from counselors that the plaintiff would "require long-term job-coaching in order to be successful in gainful work activity" and would "be most successful in a vocational setting that is highly structured with reasonable and consistent performance expectations." *James J.*, 2022 WL 558364, at *2-3 (N.D. Ill. Feb. 24, 2022). Obviously, there is nothing remotely like those assessments in the record here; no similar evidence for the ALJ to have addressed.

If there were any evidence available similar to that discussed in *James J.*, evidence that actually suggests the need for the type of job coach work accommodation that would preclude competitive work, the plaintiff had every opportunity to present it but failed to do so. The record was even left open after the hearing for plaintiff to provide a statement from his job coach about her involvement in his work at Burlington Coat Factory. But the plaintiff never provided any such evidence from a job coach. Plaintiff has been represented by counsel since July 2020 (R. 126, 185), and must be presumed to have made his best case for benefits. *Summers v. Berryhill*, 864 F.3d 523, 527 (7th Cir. 2017); *Skinner v. Astrue*, 478 F.3d 836, 842 (7th Cir.2007).

Simply put, there was nothing more for the ALJ to have done on this topic. All that is required is that the ALJ minimally articulates her reasoning. *Grove v. Kijakazi*, No. 21-1980, 2022 WL 1262131, at *2 (7th Cir. Apr. 28, 2022); *Grotts v. Kijakazi*, 27 F.4th 1273, 1277-78 (7th Cir. 2022); *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008). The ALJ considered the issue of a

14

necessary workplace accommodation but, given the medical and psychological evidence, and the reports from vocational counseling, determined there was no support for it. (R. 27 ). *See Braun v. Saul*, 783 F. App'x 789 (9th Cir. 2019)("The record contains substantial evidence that [plaintiff] could remain on task and work effectively without extensive job coaching . . . . We affirm the ALJ's determination that he is not 'disabled' within the meaning of the Act."). There was no requirement, as the plaintiff seems to demand, that the ALJ go on to "delicately thread the needle in a distinction between having and needing a job coach." [Dkt. #16, at 2]. *See Jacob v. Berryhill*, 756 F. App'x 709, 713 (9th Cir. 2018)("Because the RFC represents "the most [a claimant] can still do despite [his or her] limitations, . . . rather than a claimant's ideal work conditions, the ALJ did not err by not incorporating [doctor's] recommendations when assessing [plaintiff's] RFC."); *Hofstad v. Kijakazi*, No. 21-CV-352-SCD, 2022 WL 3057243, at *5 (E.D. Wis. Aug. 3, 2022)("In other words, receiving job-coaching services would be ideal but not required. Because [the doctor's] job-coaching comment was not clearly a medical opinion, the ALJ didn't need to address it.").

## CONCLUSION

For the foregoing reasons, the defendant's motion for summary judgment [Dkt. #14] is granted, and the plaintiff's motion for summary judgment [Dkt. # 9] is denied.

ENTERED: _____

UNITED STATES MAGISTRATE JUDGE

**DATE:** 3/16/23

15